322 F.3d 1335
 LACKS INDUSTRIES, INC., Plaintiff-Appellant,
v.
McKECHNIE VEHICLE COMPONENTS USA, INC. (doing business as Thompson International), Defendant-Cross Appellant, and
Hayes Wheel International, Inc. (now known as Hayes Lemmerz International, Inc.), Defendant-Cross Appellant.
 No. 01-1371.
 No. 01-1395.
 No. 01-1396.
 United States Court of Appeals, Federal Circuit.
 Decided March 13, 2003.
 
 COPYRIGHT MATERIAL OMITTED David W. Wicklund, Shumaker, Loop & Kendrick, LLP, of Toledo, OH, argued for plaintiff-appellant. With him on the brief was Jeffrey S. Creamer. Of counsel on the brief was Remy J. VanOphem, VanOphem & VanOphem, P.C., of Troy, MI.
 J. Michael Huget, Butzel Long, of Ann Arbor, Michigan, argued for defendant-cross appellant McKechnie Vehicle Components USA, Inc. (doing business as Thompson International). With him on the brief was John C. Blattner.
 Stephen E. Glazek, Barris, Sott, Denn & Driker, PLLC, of Detroit, MI, for defendant-cross appellant Hayes Wheel International, Inc. (now known as Hayes Lemmerz International, Inc.) Of counsel on the brief was William J. Clemens, MacMillan, Sobanski & Todd, LCC, of Livonia, MI. Of counsel was Kathryn A. Viviano, Barris, Sott, Denn & Driker, PLLC, of Detroit, MI.
 Before NEWMAN, MICHEL and CLEVENGER, Circuit Judges.
 Opinion for the court filed by Circuit Judge MICHEL. Opinion concurring in part and dissenting in part filed by Circuit Judge PAULINE NEWMAN. Opinion dissenting in part filed by Circuit Judge CLEVENGER.
 MICHEL, Circuit Judge.
 
 
 1
 Plaintiff-appellant Lacks Industries, Inc. ("Lacks") appeals the rulings of the United States District Court for the Eastern District of Michigan: (1) granting summary judgment of noninfringement of method claims 1 and 2 of U.S. Patent No. 5,577,809 ("the `809 patent") and product claims 1, 2, 4-6, 8, 9, 11, 12, and 14-16 of U.S. Patent No. 5,636,906 ("the `906 patent"); (2) granting summary judgment of invalidity for obviousness of all the asserted claims of the `809 and `906 patents; (3) granting summary judgment of invalidity under § 102 of method claims 1, 3, and 8 of U.S. Patent No. 5,597,213 ("the `213 patent"); and (4) adopting a Special Master's findings after trial of invalidity of method claims 11-13, 20-22, and 24-25 of the `213 patent as a result of Lacks' commercial activities. Defendants-cross appellants Hayes Wheel International, Inc. ("Hayes") and McKechnie Vehicle Components USA, Inc. ("McKechnie") cross-appeal the court's decisions adopting the Special Master's findings after trial: (1) that claims 11-13, 20-22, and 24-25 of the `213 patent were not proven invalid under § 102(b) as a result of any offer to sell or public use by Hayes or McKechnie and (2) that defendants' product infringed claims 11-13, 20, and 24-25 of the `213 patent.
 
 
 2
 We affirm: (1) the grants of summary judgment of noninfringement of the '809 and '906 patents; (2) the grant of summary judgment of invalidity under § 102 of claims 1, 3, and 8 of the '213 patent; (3) the finding of infringement of claims 11-13, 20, and 24-25 of the '213 patent; and (4) the finding that claims 11-13, 20-22, and 24-25 of the '213 patent were not proven invalid as a result of the pre-critical date public use or sale by Hayes or McKechnie. Because the Special Master applied an incorrect legal standard, we vacate and remand his finding that claims 11-13, 20-22, and 24-25 of the '213 patent were invalid because of Lacks' pre-critical date sales promotion activities. Because we need not reach a mere affirmative defense, and decline to do so, we vacate the district court's grant of summary judgment of invalidity for obviousness of the asserted claims of the '809 and '906 patents.
 
 I.
 
 3
 The parties are all involved in the manufacture and sales of cladded wheels: automotive wheels that have a decorative cover[1] attached to their outer face (the side facing out from the automobile). The development of these wheels has been driven by cost and aesthetic considerations. Apparently, automobile buyers increasingly desire wheels with a shiny chrome look. Automobile manufacturers and suppliers want to meet this growing consumer demand without having to plate the entire wheel in chrome, an expensive process. As a result, inventors have developed chrome-plated cladding that covers only the visible portion of the wheel. This cladding is attached as a snug, plastic or metal skin over the outer wheel face, thus giving the wheel a chrome-like appearance at less cost than chrome plating of the entire wheel.
 
 
 4
 Lacks owns by assignment (from named inventor Lee Chase) the '809, '906, and '213 patents, all covering various aspects of cladded wheels. Chase filed his original patent application, No. 904,180, on June 25, 1992. Thereafter he filed divisional applications on June 7, 1995 and March 29, 1995 which led to the '809 patent and the '906 patent, respectively. Both patents share a common specification, though the '809 patent is drawn to a method for making cladded wheels and the '906 patent is drawn to the cladding as an apparatus. The '213 patent sprang from the same work as the '809 and '906 patents, but matured from its own June 6, 1995 application and has a disclosure different from that of the '809 and '906 patents. The '213 patent discloses a method and apparatus for the assembly of a cladded wheel through the use of a temporary securing and positioning means and the selective application of an adhesive. Lacks currently manufactures, assembles, and sells a cladded wheel product based on these patents.
 
 
 5
 Lacks sued Hayes and McKechnie for infringement of the '809, '906, and '213 patents by their manufacture and sale of cladded wheels based on McKechnie's U.S. Patent No. 5,368,370 ("the '370 patent"). After Lacks filed suit, many of the asserted claims in the '809 and '906 patents were withdrawn by stipulation. Infringement of the remaining claims of those two patents and the asserted claims of the '213 patent was first addressed by the district court when confronted with multiple motions for partial summary judgment. Lacks moved for summary judgment of infringement of '809 patent claim 1; '906 patent claims 1, 11, and 16; and '213 patent claims 25 and 40. Defendants cross-moved for summary judgment of noninfringement of '809 patent claims 1 and 2; '906 patent claims 1-2, 4-6, 8-9, 11-12, and 14-16; and '213 patent claims 1, 3, 7-9, 32, 35, and 37-40.
 
 
 6
 In addressing the '809 and '906 patents, the district court first construed the disputed limitations. Claim 1 of the '809 patent is representative of the asserted claims of both the '809 and '906 patents[2] (disputed claim language underlined):
 
 
 7
 1. A method for providing a decorative surface on a vehicle wheel having a web portion and a peripheral rim portion for mounting a vehicle tire, said peripheral rim portion defining an axial peripheral lip circumscribing said peripheral rim portion and structural means interconnecting said web portion and said peripheral rim portion, said web portion and said peripheral rim portion defining a wheel face outer surface, said method comprising the steps of:
 
 
 8
 forming a thin solid ornamental panel of uniform thickness having an interior and exterior surface, said thin solid formed ornamental panel being shaped to cover said entire wheel face outer surface and not cover said axial peripheral lip so as to mate to said wheel and substantially conform said exterior surface of said thin solid formed ornamental panel to adjacent contours of said wheel face outer surface of said wheel;
 
 
 9
 applying a decorative layer on said exterior surface of said thin solid formed ornamental panel;
 
 
 10
 applying an adhesive to one of said wheel face outer surface of said wheel and said interior surface of said thin solid formed ornamental panel; and
 
 
 11
 positioning said interior surface of said thin solid formed ornamental panel against said adhesive so as to adhere said thin solid formed ornamental panel to said wheel face outer surface;
 
 
 12
 whereby said positioning step locates said thin solid formed ornamental panel so as to be substantially flush with adjacent portions of said wheel face outer surface of said wheel such that said decorative layer readily blends with said axial peripheral lip circumscribing said peripheral rim portion so as to provide a visual impression that said decorative layer is substantially flush with said adjacent portions of said wheel face outer surface and thereby appears to constitute an integral portion of said wheel.
 
 
 13
 '809 patent, cols. 10-12. First, the court construed the claim term "axial peripheral lip" in both the '809 and '906 patents to mean "that uncovered surface of the composite wheel that starts at the edge of the cladding, goes up and over the top of the projecting rim lip, and ends where the outer side of the rim lip merges with the tire mounting surface of the wheel rim." Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc., 55 F.Supp.2d 702, 711 (E.D.Mich.1999). Second, the court construed "wheel face outer surface" in both the '809 and '906 patents to mean "the entire area of the wheel's exposed face that lies within the circumscribing boundary of the inner shoulder of the axial peripheral lip." Id. at 712. Third, in light of the undisputed structure of the accused product[3] and because the district court construed the claim terms such that the cladding must cover all of the outer face and none of the axial peripheral lip, the court granted summary judgment of noninfringement of the asserted claims of the '809 and '906 patents. Id. at 722-23.
 
 
 14
 The court also addressed several other issues. The court granted summary judgment of invalidity under § 102 of claims 1, 3, and 8 of the '213 patent because of the publication of Lacks' foreign patent applications corresponding to the '809 and '906 patents. Id. at 736-37. The court also granted summary judgment of invalidity for obviousness of the asserted claims of the '809 and '906 patents. Id. at 731. The court found that the combination of three prior art references, all drawn to decorative wheel coverings, provided a prima facie case of obviousness and that Lacks' evidence of secondary considerations failed to rebut that prima facie case. In addition, the court construed all relevant limitations in the asserted claims — both in addressing the motions for partial summary judgment and in a separate Markman order — and denied several other motions for partial summary judgment.
 
 
 15
 By agreement of the parties, the remaining issues on infringement and validity were referred to a Special Master for trial. In an extensive (82-page) written opinion, the Special Master found claims 11-13, 20, and 24-25 of the '213 patent infringed and claims 11-13, 20-22, and 24-25 of the '213 patent invalid. As to infringement, the dispute centered on the limitation that an adhesive "permanently secure" the cladding to the wheel. The following excerpt from claim 11 of the '213 patent is representative of the relevant limitation: "[A]ssembling said overlay to said outboard surface of said wheel with said curable adhesive so as to form said gap and permanently secure said overlay to said wheel, at least one void being present between said overlay and said outboard surface of said wheel." '213 patent, col. 15, lines 29-33 (emphasis added). The district court in its Markman order, construed the "permanently secure" limitation to mean "that the curable adhesive is itself capable of securing the overlay to the wheel during the normal useful life of the wheel." After trial, the Special Master found this limitation met and therefore found that Hayes and McKechnie literally infringed claims 11-13, 20, 24 and 25 of the '213 patent.
 
 
 16
 The Special Master next considered the validity of the '213 patent. First, the Special Master found that claims 11-13, 20-22, and 24-25 of the '213 patent were not invalid as a result of any prior offer for sale or public use by the defendants. The issue here was whether the cladded wheel product used publicly and offered for sale by defendants used only partial adhesive coverage to attach the cladding to the wheel and therefore embodied the claimed method. The Special Master found the defendants had not clearly and convincingly proven this fact because the recollection testimony of three Hayes employees to that effect was insufficiently corroborated by documentary evidence. Second, the Special Master found that Lacks' own pre-critical date sales promotion activities were sufficiently commercial to raise the on-sale bar, thus invalidating these claims. The issue here was whether Lacks' activities constituted an offer for sale. The Special Master found that they did, relying on our decision in RCA Corp. v. Data General Corp., 887 F.2d 1056, 12 USPQ2d 1449 (Fed.Cir.1989). The district court adopted the Special Master's findings in their entirety and entered judgment accordingly.
 
 
 17
 All rulings discussed heretofore have been timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).
 
 II.
 
 18
 We are presented here with a grant of summary judgment of noninfringement and a trial court's findings of infringement based on a Special Master's recommendations. We review de novo the grant of summary judgment. Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1275 (Fed.Cir.1998). Summary judgment is appropriate if, drawing all factual inferences in favor of the non-movant, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The findings of a special master, to the extent that the court adopts them, shall be considered as the findings of the court" and we review them for clear error. Fed. R.Civ.P. 52(a).
 
 
 19
 Patent infringement analysis involves two steps. Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 988, 50 USPQ2d 1607, 1609 (Fed.Cir.1999). First, the court determines the scope and meaning of the asserted claims. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372-74, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This claim construction is an issue of law and is reviewed without deference to the district court. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed. Cir.1998) (en banc). Second, the claims as construed by the court are compared to the allegedly infringing device. Johnson, 175 F.3d at 988, 50 USPQ2d at 1609. The determination as to whether the claims, as properly construed, read on the accused device presents an issue of fact that we review for clear error. Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 976, 52 USPQ2d 1109, 1111 (Fed.Cir.1999).
 
 
 20
 In engaging in the first step, claim construction, we begin with an examination of the intrinsic evidence, i.e., the claims, the other portions of the specification, and the prosecution history (if in evidence). Gart v. Logitech, Inc., 254 F.3d 1334, 1339, 59 USPQ2d 1290, 1293-94 (Fed.Cir.2001). Courts may also review extrinsic evidence in construing a claim. E.g., Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378, 49 USPQ2d 1065, 1068 (Fed.Cir. 1998). Additionally, dictionary definitions, although extrinsic, may be used to establish a claim term's ordinary meaning. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 n. 6, 39 USPQ2d 1573, 1580 n. 6 (Fed.Cir.1996).
 
 
 21
 
 A. Lacks' Appeal of Summary Judgment of Noninfringement of the Asserted Claims of the '809 and '906 Patents.
 
 
 
 22
 On appeal Lacks argues that the district court erred in its construction of the limitations "axial peripheral lip" and "wheel face outer surface" in the '809 and '906 patents. Focusing first on "axial peripheral lip," the district court construed the term to mean "that uncovered surface of the composite wheel that starts at the edge of the cladding, goes up and over the top of the projecting rim lip, and ends where the outer side of the rim lip merges with the tire mounting surface of the wheel rim." Lacks, 55 F.Supp.2d at 711. According to Lacks, however, "axial peripheral lip" refers only to the projecting lip at the outermost edge of the wheel rim, as this is the plain meaning of the language. For support Lacks recites the dictionary definitions of "axial" ("around an axis"), "peripheral" ("of, relating to or forming a periphery," which is defined as "the perimeter of a circle"), and "lip" ("the edge or margin of a hollow vessel or cavity," or "an edge" or "margin"). Webster's Third International Dictionary (1997). These definitions, Lacks argues, render plain the meaning of "axial peripheral lip" as "the edge at the outermost perimeter circumscribing the rim."
 
 
 23
 Lacks next points to the prosecution history, noting that the limitation was added through amendment after the examiner rejected the claims as obvious in light of U.S. Patent No. 3,726,566 ("the Beith patent"). The Beith patent taught a decorative wheel cover extending over the outermost edge of the wheel rim. To avoid Beith, Lacks added the "axial peripheral lip" limitation and also added the language about the panel blending with the lip to provide a visual impression that the decorative layer "appears to constitute an integral portion of said wheel." Lacks argues that one of ordinary skill in the art would realize that its amendment surrendered only enough subject matter to get around Beith. Therefore, Lacks contends, the "axial peripheral lip" limitation only prevents the decorative cover from extending over the outermost edge of the wheel rim.
 
 
 24
 Lacks' arguments fail to persuade us that its construction is correct. First, the dictionary definitions do not provide a plain meaning. As McKechnie points out, these definitions also fit the district court's construction. Second, Lacks' amendment to overcome the Beith patent, although providing some support for Lacks' construction, does not outweigh the support for the district court's construction present in the claim language and the specification. The district court observed that the limitation appears at three points in claim 1 of the '809 patent and concluded, from this context, that the axial peripheral lip "is not covered by the panel" and "touches the edge of the decorative layer in such a way that aesthetic blending occurs." Lacks, 55 F.Supp.2d at 710. The final point is key, because under Lacks' construction this "aesthetic blending" would have to occur between two things that are not adjacent: the outermost edge of the wheel rim and the edge of the cladding. While this is not impossible, it is unlikely and the district court's construction avoids such a problem.
 
 
 25
 The drawings also support the district court's construction. Figures 3 and 5 disclose the preferred embodiment of the '809 patent and explicitly identify a "peripheral rim portion or rim 12" and an "axial peripheral lip 12a."
 
 
 26
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 27
 Here, the diagrams indicate two separate edges on the wheel rim, an interior one facing the center of the wheel, and an external one facing the outside. Notably, the pointer in figure 3 points to the outermost edge (supporting Lacks' construction), while the pointer in figure 5 points to the middle of the flat between the inside and outside edges. We do not think it reasonable to view one diagram as correct, but the other as erroneous. The better interpretation is that these references both refer to the larger structure the district court construed as being the "axial peripheral lip."
 
 
 28
 In sum, the weight of the intrinsic evidence supports the district court's construction and we therefore uphold the district court's construction of "axial peripheral lip."
 
 
 29
 Lacks also challenges the court's construction of "wheel face outer surface" in the '809 and '906 patents. The district court construed the term to mean "the entire area of the wheel's exposed outer face that lies within the circumscribing boundary of the inner shoulder of the axial peripheral lip." Id. at 712. On appeal, Lacks argues that the dimensions of the cladding define the "wheel face outer surface," so long as the cladding covers some of the web and rim portions.[4] Again we are not persuaded.
 
 
 30
 Lacks' proposed construction is simply not consistent with the language of the claims. As the district court noted, the limitation first appears in the preamble of claim 1 of the '809 patent: "A method for providing a decorative surface on a composite vehicle wheel having a web portion and a peripheral rim portion for mounting a vehicle tire ... said web portion and said peripheral rim portion defining a wheel face outer surface." '809 patent, col. 10, lines 65-67, col. 11, lines 3-5 (emphasis added). The limitation also appears later in the claim: "said thin solid formed ornamental panel being shaped to cover said entire wheel face outer surface and not cover said axial peripheral lip." Id. col. 11, lines 8-11. From this language the district court reasoned that "wheel face outer surface" must be the "area of the wheel's exposed outer face that lies within the circumscribing boundary of the inner shoulder of the axial peripheral lip." Lacks, 55 F.Supp.2d at 712.
 
 
 31
 Given this clear language, Lacks' arguments to the contrary are not persuasive. The district court's construction is the only reading consistent with the plain language of the claim limitation and we therefore uphold the district court's construction of "wheel face outer surface."
 
 
 32
 This brings us to the second step in the infringement analysis, the comparison of the claims as construed to the allegedly infringing product. Because we uphold the court's claim construction, we also affirm the court's grant of summary judgment because noninfringement follows inexorably in this case from the claim construction. Id. at 722. This is because it is undisputed that the accused product covers at least part of the axial peripheral lip as construed and therefore cannot satisfy the "not cover said axial peripheral lip" limitation in the asserted claims. Id. at 722-23.
 
 
 33
 
 B. Hayes' and McKechnie's Cross-Appeal of the Finding of Infringement of the '213 Patent.
 
 
 
 34
 The district court adopted the Special Master's post-trial finding that Hayes and McKechnie literally infringed claims 11-13, 20, 24, and 25. The sole infringement issue on the cross-appeal, as below, is whether the defendants' product satisfied the limitation that the adhesive "permanently secure" the cladding to the wheel. The district court construed "permanently secure" to mean that the "adhesive is itself capable of securing the overlay to the wheel during the normal useful life of the wheel." (emphasis in original). After hearing testimony about various industry standards and tests, the Special Master found this limitation met.
 
 
 35
 In their cross-appeal, Hayes and McKechnie argue the Special Master erred in finding infringement. They first contend that in adopting his standard, he impermissibly re-construed the limitation, reading out the requirement that the adhesive secure the cladding by "itself." The Special Master found that the limitation would be met if the adhesive: "(1) satisfies the specifications set forth on the Hayes engineering drawing for the accused F-150 wheel and (2) retains sufficient retentive strength (without reliance on the mechanical locking system) to secure the overlay throughout Ford's vehicle durability testing, but with a modified upper temperature limit." Defendants-cross appellants argue the Special Master erred because both the specification and test he adopts as his standard accounted for the presence of their mechanical lock.
 
 
 36
 Their second set of arguments challenge the evidentiary support of the Special Master's findings regarding what test conditions and results warrant an inference that the "permanently secure" limitation is met. They assert that Lacks' evidence is insufficient to support a finding of infringement because (1) Lacks only did certain laboratory tests of the accused device, without testing the adhesive under road conditions, and (2) they never tested the device without the mechanical lock so that the adhesive was the only thing holding it together. If the Special Master had properly addressed the above deficiencies, defendants-cross appellants maintain, it would have been clear that the adhesive in the accused product cannot hold up for the life of the wheel under the intense heat and stress conditions of normal use.
 
 
 37
 Upon review, we cannot say that the Special Master's findings were clearly erroneous. First, we reject the argument that he reconstrued the "permanently secured" limitation, reading out the requirement that the adhesive itself secure the cladding. A far more accurate reading of the Special Master's analysis is that he simply evaluated evidence of the conditions a wheel would encounter during its normal useful life and created a benchmark for measuring whether those conditions were met by "construct[ing] a mosaic of numerous laboratory and vehicle tests and related trial testimony." Such an amalgamation of different tests and specifications was necessary because "no separate specifications existed for securing overlays ... to wheels." He chose the particular specification and test in creating his standard because he found that they represented the conditions cladded wheels would encounter in their normal use, not because they were designed to test whether an adhesive could itself secure a cladding to a wheel over its useful life. At all times he explicitly recited his task as determining whether the adhesive "itself" was capable of "permanently securing" the cladding for the life of the wheel. We accept that he did so.
 
 
 38
 Second, there was evidence to support the infringement findings that these conditions were satisfied by the accused product. There was evidence of the specifics of each individual test in the form of expert and other testimony and documents. First, the shear (coupon) tests on two small, flat panels joined by the adhesive at issue showed "[a]cceptable adhesion was obtained throughout all test conditions." Second was Lacks' rotary and radial fatigue and impact testing of new, unused Hayes wheels with the mechanical lock disabled, after which the testers were "unable to remove the cladding by prying with a small tool." Third, and most persuasive were McKechnie's 1998 tests of wheels that "had been subjected to a durability cycle that included several adverse environmental conditions." In the subsequent pull off testing, nearly 800 pounds of force was required to remove the cladding from the wheel utilizing only the mechanical lock, whereas 1500 pounds of force was required to remove the cladding from the wheel using only the adhesive. The Special Master found this to be especially relevant, given McKechnie's assertions that the mechanical lock itself was the sole cause of permanent retention of their cladding to the wheels.
 
 
 39
 In sum, because we reject Hayes' and McKechnie's argument that the Special Master reconstrued the "permanently secured" limitation and because there was evidence to support the Special Master's finding of infringement of the '213 patent, we affirm the court's rulings as not clearly erroneous.
 
 III.
 
 40
 The district court granted summary judgment of both invalidity for obviousness of the asserted claims of the '809 and '906 patents and invalidity for anticipation of claims 1, 3, and 8 of the '213 patent. After a bench trial, a Special Master found claims 11-13, 20-22, and 24-25 invalid under the on-sale bar as a result of Lacks' pre-critical date sales promotion activities and found that no bar resulted from the pre-critical date activities of Hayes and McKechnie.
 
 
 41
 As a threshold matter, we note that we do not reach the validity issues pertaining to the '809 or '906 patents because we have affirmed the trial court's grant of summary judgment of non-infringement and because invalidity was raised below merely as an affirmative defense to infringement. See Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 93, 102, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) (holding that a court's affirmance of a finding of non-infringement is not per se a sufficient reason for vacating a declaratory judgment holding the patent invalid, but noting "[a]n unnecessary ruling on an affirmative defense is not the same as the necessary resolution of a counterclaim for a declaratory judgment"); Hill-Rom Co., Inc. v. Kinetic Concepts, Inc., 209 F.3d 1337, 1344, 54 USPQ2d 1437, 1442 (Fed.Cir. 2000) (holding that it need not reach or vacate the district court's finding that a patent was not invalid where it had affirmed the trial court's judgment of noninfringement). We address the remaining issues in turn.
 
 
 42
 
 A. Lacks' Appeal of Summary Judgment of Invalidity of Claims 1, 3, and 8 of the '213 Patent under Section 102.
 
 
 
 43
 The district court granted summary judgment of invalidity of claims 1, 3, and 8 of the '213 patent under § 102 because of the publication of Lacks' foreign patent applications corresponding to the '809 and '906 patents. Lacks, 55 F.Supp.2d at 736-37. Although referencing § 102, the district court did not specify whether its analysis was under subsection (a) or (b). While the court referred to its analysis simply as "anticipation," the correct reading of the court's opinion is that it was referring to a § 102(b) statutory bar. For example, the court noted that "the foreign patents were published more than one year before the filing of the application for the '213 patent," Lacks, 55 F.Supp.2d at 736 n. 18, an inquiry that is only relevant under § 102(b). In addition, "Lacks [did] not dispute that the foreign patents are prior art" before the district court, Lacks, 55 F.Supp.2d at 736, nor does it on appeal. However, it is "well-settled" law that an inventor's own disclosure "will not anticipate his later invention unless that prior work is such as to constitute a statutory bar under Section 102(b)." Donald S. Chisum, 1 Chisum On Patents § 3.08[2][a] (1999). We therefore conclude that the district court performed its analysis under § 102(b).
 
 
 44
 On appeal, Lacks argues only that the foreign applications neither disclose nor teach the "temporary positioning and securing" means for centrally locating the cladding relative to the rim and for securing the cladding for a sufficient time to allow the adhesive to cure. We do not agree.
 
 
 45
 The specification of the '809 and '906 patents expressly discloses these two elements.[5] The specification discloses the use of temporary positioning and securing means, including "bosses" and adhesive, to maintain the decorative cladding in a central location until the claimed permanent adhesive can be applied. '809 patent, col. 7, lines 29-41. As the specification notes, this permits the cladding to be "accurately positioned on the wheel disk." Id. col. 7, lines 43-44. The specification further discloses the use of an adhesive to "permanently" adhere the cladding to the wheel surface. Id. col. 8, lines 5-6. These two disclosures either contain or at least suggest a "permanent" configuration for adhesively securing the cladding. Id. col. 8, lines 5-8. Therefore, we find no reversible error in the district court's grant of summary judgment of invalidity of claims 1, 3, and 8 of the '213 patent. Accordingly, we affirm that grant.
 
 
 46
 
 B. On-sale Bar of the Remaining Claims of the '213 Patent.
 
 
 
 47
 Under § 102(b) "[a] person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States ...." 35 U.S.C. § 102(b) (2000). A two-prong test governs the application of the on-sale bar: "First, the product must be the subject of a commercial offer for sale .... Second, the invention must be ready for patenting." Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A § 102(b) determination is a conclusion of law based on underlying findings of fact. Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1047, 61 USPQ2d 1225, 1229 (Fed.Cir.2001). As such, we review the ultimate determination de novo, and the underlying findings for clear error. Id.
 
 
 48
 
 1. Lacks' Appeal of the Finding of On-sale Bar As a Result of Its Own Activities.
 
 
 
 49
 The Special Master found that Lacks' pre-critical date sales promotion activities created an on-sale bar to claims 11-13, 20-22, and 24-25 of the '213 patent. He based his finding on Lacks' extensive commercial activity more than one year before it filed its patent application. On appeal, Lacks challenges the finding. The crux of the dispute is whether the Special Master applied the proper legal standard to the first prong of the test: whether there was a "commercial offer for sale." We hold that he did not.
 
 
 50
 The standard for determining what constitutes an offer to sell sufficient to raise the on-sale bar had been subject to some confusion and change. For many years this court applied a flexible, "totality of circumstances" standard in its application of the on-sale bar. See, e.g., Envirotech Corp. v. Westech Eng'g Inc., 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir. 1990). Under that test "no single finding or conclusion of law [was] a sine qua non" to a holding that the statutory bar arose. Id. As to what constituted an offer for sale, cases had held that a "definite offer for sale" was required. Id. at 1575, 15 USPQ2d at 1232. In interpreting that requirement at least one opinion noted that "this requirement may be met by a patentee's commercial activity which does not rise to the level of a formal `offer' under contract law principles." RCA Corp., 887 F.2d at 1062, 12 USPQ2d at 1454. Things began to change when the Supreme Court swept away the "totality of circumstances" test in Pfaff, 525 U.S. at 67, 119 S.Ct. 304, replacing it with the two-prong test recited above. The Court in Pfaff did not, however, expound upon its requirement of a "commercial offer for sale," as that was not an issue in the case.
 
 
 51
 After the Special Master issued his findings and conclusions, we clarified this standard in Group One, Limited v. Hallmark Cards, 254 F.3d 1041, 59 USPQ2d 1121 (Fed.Cir.2001). In Group One we held that "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." Id. at 1048, 59 USPQ2d at 1126. In so holding, we noted that Federal Circuit law, not state contract law, would control and that we would look to the Uniform Commercial Code ("UCC") for guidance as to whether a particular communication rose to the level of a "commercial offer for sale." Id. at 1047, 59 USPQ2d at 1126; accord Linear Tech., 275 F.3d at 1048, 61 USPQ2d at 1229-30 (following Group One and reversing the district court's invalidation under § 102(b) because the alleged activities did not constitute a contractual offer for sale under the UCC).
 
 
 52
 Turning now to the Special Master's analysis, it is clear that he performed his analysis under the wrong standard. The Special Master relied on his findings that Lacks "(1) vigorously solicited wheel manufacturers to whom Lacks could sell overlays and on whose wheels Lacks could perform its overlay-bonding method, and (2) vigorously solicited [original equipment manufacturers] to specify and purchase wheels clad by the later-patented method." For example, the Special Master relied on a Lacks eleven-page "Wheel Meeting Agenda" dated May 1993 that included a description of the product and its benefits, a plan to "validate assemblies following a plan jointly developed with [the] customer," and the approximate cost-savings as a result of achieving a chrome finish using Lacks' product. Importantly, however, the Special Master did not find this activity, nor any other of Lacks' activities, to be a commercial offer for sale as defined by contract law. Rather, he proceeded at length on the theory that "contract law principles do not govern § 102(b) issues." Particularly telling is his statement that:
 
 
 53
 Lacks is correct to the extent that there is no evidence of an offer to sell a particular cladded wheel for a specified vehicle at a specific price. But the RCA definition of a "definite offer" does not require that specificity: "The requirement of a definite offer excludes merely indefinite or nebulous discussion about a possible sale. While this requirement may be met by a patentee's commercial activity which does not rise to the level of a formal offer under contract law principles, a definite offer in the contract sense clearly meets this requirement."
 
 
 54
 (emphasis added). As noted above, we rejected the RCA non-contract approach in Group One, 254 F.3d at 1048, 59 USPQ2d at 1125. As the Special Master explicitly relied on a standard requiring something less than "a formal offer under contract law principles," we must hold he erred by applying the wrong legal standard in determining whether there was an offer for sale under § 102(b).
 
 
 55
 Defendants-cross appellants urge that any such error was harmless because the factors that inform whether there was a contractual offer under the UCC include course of dealing and evidence of the practice in the industry. U.C.C. § 1-205. According to the defendants, Lacks' activities amounted to a contractual offer for sale because "that is how business is done in the automotive industry." We, however, cannot so conclude as a matter of law on the record before us. Although it contains some evidence about how sales are made in the automotive industry, we cannot tell what the fact-finder would have found had he applied the correct legal standard. In fact, the only evidence of industry practice defendants point out to us on appeal is their unsupported description of their own sales experience with Ford. As a result, we vacate the Special Master's finding of invalidity and remand for further consideration. On remand the district court (or Special Master) may need to take additional evidence on the practice in the industry to determine if the activities by Lacks rise to an offer for sale under the UCC. It may also be possible to make new fact-findings based on the existing record. We leave this determination to the court's sound discretion.
 
 
 56
 
 2. Cross-Appeal Asserting Public Use and On-sale Bars by Hayes' and McKechnie's Activities.
 
 
 
 57
 The Special Master found that the activities of Hayes and McKechnie did not give rise to a § 102(b) bar. The Special Master determined, and Lacks does not challenge, that the "the Defendants had some kind of adhesively-bonded, chrome-cladded F-150 wheel assembly on sale to, and in public use by, Ford prior to the June 6, 1994 critical date." Nevertheless, the Special Master decided against applying the statutory bar, because he found insufficiently corroborated the testimony that the manufacture of defendants' device used the entire claimed method of claims 11-13, 20-22, and 24-25 of the '213 patent. Specifically, the Special Master found that Hayes and McKechnie had not clearly and convincingly proven that their device had at least one void between the overlay and the outboard surface (as required by independent claim 11, upon which claims 12-13, 20-22, and 24 depend) and wherein that void trapped air between the overlay and the wheel (as required by independent claim 25) — i.e., whether the accused device used partial, rather than full, adhesive coverage in securing the cladding.
 
 
 58
 On appeal, Hayes and McKechnie argue that the Special Master committed legal errors: (1) by requiring each document offered to corroborate the oral testimony to independently provide a detailed description as to the extent and pattern of adhesive coverage; and (2) refusing to allow the oral testimony of one witness to corroborate that of another. Once again, even though the ultimate question under § 102(b) may be one of law, we review the underlying factual determinations for clear error. Linear Tech., 275 F.3d at 1048, 61 USPQ2d at 1229. Because we conclude that the Special Master did not commit legal error in evaluating corroboration and because he did not clearly err in finding the clear and convincing standard not met, we affirm.
 
 
 59
 The requirement for corroboration of oral testimony occurs most often in the context of priority disputes, wherein we have held an inventor's testimony, standing alone, cannot support a claim of derivation (§ 102(f)) or priority (§ 102(g)). See, e.g., Price v. Symsek, 988 F.2d 1187, 26 USPQ2d 1031 (Fed.Cir.1993). Corroboration is also required where, as here, the testimony is from an accused infringer concerning the sale (or offer to sell) or public use of an invention more than one year before the filing of a patent. Finnigan Corp. v. ITC, 180 F.3d 1354, 1366, 51 USPQ2d 1001, 1010 (Fed.Cir.1999). Whether the asserted identity of the product with the claimed invention has been sufficiently corroborated, either by documentary or testimonial evidence, is generally measured under a "rule of reason" standard. Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1371, 47 USPQ2d 1363, 1366 (Fed.Cir.1998). Under this analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of [the evidence] may be reached." Price, 988 F.2d at 1195, 26 USPQ2d at 1037. In evaluating such evidence, we use the factors enumerated in Woodland Trust:
 
 
 60
 (1) the relationship between the corroborating witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of the patented invention and the prior use, (7) probability that a prior use could occur considering the state of the art at the time, and (8) impact of the invention on the industry, and the commercial value of its practice.
 
 
 61
 148 F.3d at 1371, 47 USPQ2d at 1366 (quoting In re Reuter, 670 F.2d 1015, 1021 n. 9, 210 USPQ 249, 255 n. 9 (CCPA 1981)).
 
 
 62
 Addressing first the cross-corroboration of oral testimony, we conclude that the Special Master rightly refused to accept it as adequate. A review of the relevant case law reveals a clear requirement that such oral testimony by interested parties must be corroborated by documentary testimony. Starting with the Supreme Court's decision in The Barbed Wire Patent Case, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1882), and ending with our recent decision in Union Carbide v. Shell Oil Co., 308 F.3d 1167, 1189, 64 USPQ2d 1545, 1560 (Fed.Cir.2002), courts have consistently required documentary corroboration of oral testimony by interested parties presented to invalidate a patent. For example, in Union Carbide we held "[u]ncorroborated oral testimony by interested parties is insufficient as a matter of law to establish invalidity of [a] patent." 308 F.3d at 1189, 64 USPQ2d at 1560 (holding the oral testimony of two Shell employees was insufficient to prove anticipation because it was otherwise uncorroborated) (citation omitted); accord Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 740-43, 63 USPQ2d 1251, 1259-62 (Fed.Cir.2002) (holding oral testimony by six interested witnesses uncorroborated by documentary evidence was not sufficient evidence to support a jury's finding of anticipation). The evidence at issue here consists of oral testimony by three Hayes employees, all of whom testified that all of the prototype wheels used in public or sold by Hayes had voids or gaps in the adhesive pattern. Because this oral testimony is not of such a character as to differentiate it from that rejected in the precedents cited above, we conclude that the Special Master did not err in not accepting the testimony of one witness to corroborate that of another.
 
 
 63
 We look now to defendants-cross appellants' second argument regarding corroboration. The documents in evidence were Minutes of a 1993 meeting with McKechnie, a 1993 Hayes memorandum, a 1994 Hayes memorandum, and Hayes' U.S. Patent No. 5,435,631 filed February 24, 1994. Hayes and McKechnie attempt to portray the Special Master's determination as requiring each document to independently provide a detailed description as to the extent and pattern of adhesive coverage, but the reasonable reading, our reading, of his findings is simply that he found the documentary evidence, as well as the witness testimony, insufficient to carry a clear and convincing burden.
 
 
 64
 The Special Master's factual determinations as to the insufficiency of the documentary evidence are thorough. He evaluated each document, discussed it thoroughly, and considered whether it corroborated the testimony of the three Hayes employees. For example, the Special Master considered the 1993 Minutes of a McKechnie meeting discussing "open areas between the overlay and the base wheel" "too general and incomplete" because "[t]he document contains no identification of the affiliation of [the author], no connection between the project being discussed and the unmentioned Hayes F 150 prototype wheels, and no description of the adhesive application pattern or quantity." After a similar discussion of each other document in evidence, the Special Master evaluated the totality of the evidence before him and found that evidence insufficient:
 
 
 65
 To satisfy their burden of proof on this defense, defendants rely on the testimony of three of their own employees ... and certain Hayes documentation. No testimony or documentation from any other source supports defendants' evidence. Here, even [their] documentation is incomplete, ambiguous, or contradictory.... [Their] proofs concerning the extent of adhesive coverage on its pre-critical date composite wheels are too incomplete, speculative, uncorroborated and contradictory to fulfill their burden of establishing correlation with the claimed invention by clear and convincing evidence. The relevant documents do not serve to persuasively corroborate the testimony of defendants' own witness, because the documents themselves are also too incomplete or contradictory to meet that standard.
 
 
 66
 (emphasis in original).
 
 
 67
 In light of the Special Master's complete and specific findings and his correct understanding of our case law on corroboration of oral testimony, we conclude that the Special Master committed no reversible error. We therefore affirm his finding that the pre-critical date activities of Hayes and McKechnie did not raise a bar under § 102(b) to claims 11-13, 20-22, and 24-25 of Lacks' `213 patent. His conclusion is affirmable as untainted by legal error and well supported by factual findings that are not clearly erroneous.
 
 IV.
 
 68
 In sum, we affirm in part, vacate in part, and remand. We affirm: (1) the district court's grants of summary judgment of noninfringement of both the `809 and `906 patents and of invalidity of claims 1, 3, and 8 of the `213 patent and (2) the court's adoption of the Special Master's findings that claims 11-13, 20, and 24-25 of the `213 patent were infringed and were not proven invalid as a result of the pre-critical date public use or sale by Hayes or McKechnie. We vacate the district court's grant of summary judgment of invalidity for obviousness of all the asserted claims of the `809 and `906 patents because we need not reach an affirmative defense to infringement not embodied in a counterclaim for declaratory judgment. Finally, we vacate and remand the court's adoption of the Special Master's finding that claims 11-13, 20-22, and 24-25 of the `213 patent were invalid as a result of Lacks' pre-critical date commercial activities because he applied an outdated legal standard. On remand the district court (or Special Master) should resolve whether or not it needs to take additional evidence on sales practice in the automotive industry to determine if the sales promotion activities by Lacks rise to a contractual offer for sale (and, of course, take such evidence if necessary). If it does not again find those claims of the `213 patent invalid, the court then must determine the extent of the damages suffered by Lacks as a result of the infringement of the `213 patent by Hayes and McKechnie.
 
 
 69
 
 AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.
 
 
 
 COSTS.
 
 
 70
 No costs.
 
 
 
 Notes:
 
 
 [1]
 The terms "decorative cover," "cladding," and "overlay" all mean the same thing
 
 
 [2]
 The parties have referred to the '809 and '906 patents together in their claim construction and literal infringement arguments, so we do not differentiate between them here either. The substance and language of both patents are similar and the patents share the same specification
 
 
 [3]
 It is undisputed that the accused product contains cladding that covers all the outer face and most (if not all) of what corresponds to the axial peripheral lip disclosed in the patent
 
 
 [4]
 The web portion of the wheel is the central portion of the wheel composed of "spokes, spiders, or webs." '809 patent, col. 6, lines 64-66. The rim portion is that portion of the wheel that circumscribes the web portion
 
 
 [5]
 Lacks concedes that the foreign specification is identical to its domestic counterpart
 
 
 
 71
 PAULINE NEWMAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 72
 I concur in part of the panel majority's opinion, and write separately to state my concerns with two aspects of the decision. First, in treating the on-sale issue, my colleagues have departed from the correct law. And second, the court has created a new and unnecessary melding of prior art, anticipation, and statutory bar, in ruling sua sponte that the `213 patent is barred by the "laying open" of foreign counterparts of related United States patents of the same inventor.
 
 
 The On-Sale Bar
 
 
 73
 The district court applied an incorrect legal standard when it held that an invalidating offer of sale under 35 U.S.C. § 102(b) may be met by a patentee's market development activity that does not meet the criteria of an offer of sale under contract law principles. As discussed in Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 59 USPQ2d 1121 (Fed.Cir. 2001), the "on sale" provision of § 102(b) is construed under general contract principles, and thus an invalidating offer must be an offer of sale "which the other party could make into a binding sales contract by simple acceptance (assuming consideration)." Id. at 1048, 59 USPQ2d at 1126. In Group One the court cited the need for national uniformity in the law of on-sale, and stressed the importance of application of contract principles in achieving this uniformity.
 
 
 74
 My colleagues on this panel depart from this simple standard and its important policy purpose, and instead hold that individual variations in industry practice control whether there has been an offer of sale under § 102(b), whether or not the contract law-based requirement of Group One is met. Thus the panel majority remands for "tak[ing] additional evidence on the practice in the industry to determine if the activities by Lacks rise to an offer for sale under the UCC." Maj. op. at 1349. Such industry-specific, local, and subjective criteria are a regression toward the imprecision of the discredited "totality of the circumstances," a standard purposefully rejected by the Supreme Court in Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d 1641 (1998). Determination of whether there has been an offer of sale in terms of § 102(b) requires objective application of uniform contract law, not indulgence based on disputed local custom in the automobile tire wheel cladding business.
 
 
 75
 In developing uniform national law it is as important that the law be consistent a cross industry boundaries as it is across state boundaries. Such consistency is undermined by the majority's new accommodation to assertions of idiosyncratic industry patterns of dealing. While principles of federalism counsel against imposing a possibly alien legal standard upon transactions that are primarily matters of state law, such as the law of sales, the panel majority is not here invoking the guidance of state law, but of practices ostensibly peculiar to a segment of the automotive industry — practices unencumbered by state law, indeed unknown, uncodified, and variable. The majority's remand for the purpose of ascertaining that industry practice is at variance with Pfaff and its implementing precedent. I must, respectfully, dissent from this novel and incorrect interpretation of the law of on-sale.
 
 
 Anticipation/Statutory Bar
 
 
 76
 Lacks' own foreign applications of common inventorship are not prior art against the `213 patent, for "prior art" must be the work of "another." The court explained in In re Land, 54 C.C.P.A. 806, 368 F.2d 866, 151 USPQ 621 (CCPA 1966):
 
 
 77
 The significant words in 102(a) are "known or used by others ... before the invention thereof by the applicant" and the parallel words in 102(e) are "application for patent by another ... before the invention thereof by the applicant" (emphasis ours). These are the key words on which resolution of the present problem turns. The real issue is whether all the evidence, including the references, truly shows knowledge by another prior to the time appellants made their invention or whether it shows the contrary. It is a question of fact.
 
 
 78
 Id. at 878, 151 USPQ at 632. I agree with the panel majority that the district court erred in invalidating Lacks' `213 patent based on anticipation by the laid-open German and Japanese counterparts of Lacks' copending 904,180 application. However, I do not agree that these foreign documents are a statutory bar against Lacks' `213 patent.
 
 
 79
 The 904,180 application is the basis of Lacks' United States Patents Nos. 5,577,809 and 5,636,906, here in suit. The `213 patent application was filed before the United States `809 and `906 patents were issued, but the German and Japanese counterpart applications of the `809 and `906 patents were opened for public inspection more than one year before the `213 application was filed. It is as incongruous as it is unnecessary to convert into a statutory bar an inventor's pending foreign patent applications on an earlier development that cannot be cited as prior art.
 
 
 80
 Consecutive patent applications on various phases of inventive subject matter are quite common when research is ongoing. The laying open of foreign patent applications, before the patents are granted, is required in some countries. These foreign counterparts are not prior art because they have the same inventor. And even if they were available as prior art or bar, if the `213 patent were of common text with the 904,180 application Lacks could be entitled to the earlier date for the common text, and if it is not of common text it is not a statutory bar to the non-common text.
 
 
 81
 The statutory rule that an inventor is not entitled to a patent if he publishes or offers to sell or publicly uses the invention more than a year before he files a patent application is designed to press the inventor into timely participation in the patent system. Thus when an invention is published, for example in a technical journal, and there is no patent filing for a year, a would-be competitor may conclude that no adverse patent rights bar his use of that technology. But when the asserted publication is a laid open foreign counterpart, no public policy requires construing this document as a dedication of all patent rights to any future enlargements and improvements of that subject matter.
 
 
 82
 Section 102 permits an inventor to present ongoing developments in successive patent applications, in the course of obstacles to the routine development of inventions. The "statutory bar" is for the purpose of assuring that the inventor's participation in the patent system is not unreasonably delayed. When the patent application is timely under United States law, it is not reasonable to subject it to an invalidating bar by foreign publication of an earlier specification that is not prior art.
 
 
 83
 The `213 patent is a method patent. It is not the same invention as described in the 904,180 application as laid open in Germany and Japan. The 904,180 specification describes the plastic overlay, its shape, composition, and the electroplating of its surface, and also describes the formation of the composite wheel by attaching the overlay to the underlying wheel. In the 904,180 specification the method of attaching the overlay to the wheel is generally stated without details, for example: "The panel 22 is adhesively bonded directly to the outboard surface of the wheel 11 either with a suitable adhesive 30 as shown, or in any other suitable manner." `809 patent, col. 9, lines 55-57. In contrast, the `213 patent describes in detail the method of attaching the overlay to the underlying wheel using a slow-curing adhesive; the pattern of adhesive application is discussed at length, with discussion of such considerations as maintaining wheel balance, minimizing weight, providing a seal to keep dirt and moisture out of the space between the overlay and the wheel, and compensating for irregularities in the underlying wheel shape. This subject matter is not in the 904,180 application, and is not in the laid open German and Japanese documents.
 
 
 84
 Also described at length in the `213 patent are the inventor's solutions to the problem of accurately locating the overlay and holding it in position for the several hours required for the permanent adhesive to cure. This is set forth in the `213 patent as the temporary attachment for which several methods are described, including using a weaker, hot melt adhesive for the purpose, or an adhesive tape, or a mechanical fastener. These methods are not set forth in the German and Japanese documents except for the boss used to locate and position the overlay, although without suggestion that this boss provides a temporary attachment while the adhesive cures. Indeed, the use of a slow-curing adhesive is not mentioned in the German and Japanese documents, for the 904,180 specification states no need for a temporary attachment, mechanical or otherwise.
 
 
 85
 To constitute a statutory bar, the publication must describe and enable[1] the same invention as claimed in the patent alleged to be barred, in the same technologic detail. The 904,180 specification is directed to the metal-plated overlay and the composite wheel, and the `213 patent is directed to the method of assembling the overlay and the wheel, and includes operative details and embodiments not previously described. On this ground alone, the 904,180 foreign counterparts do not bar the `213 patent. No public interest is served by a law that turns earlier developments into a bar to any later patent, requiring either secrecy or the need to forego foreign patents that are promptly laid open. Such pitfalls are not required by the Patent Act, and should not be created by this court.
 
 
 86
 Thus I must also dissent from the court's holding that the publication of the foreign counterparts of the 904,180 application produced a statutory bar to claims of the `213 patent.
 
 
 
 Notes:
 
 
 [1]
 Lacks had argued at trial that the 904,180 application does not contain an enabling disclosure of the subject matter of the `213 patent. The district court did not decide this point, deeming the issue to be "anticipation" and stating that an anticipating reference need not be an enabling reference. That statement is incorrectSee, e.g., Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1354, 65 USPQ2d 1385, 1416 (Fed.Cir. 2003) ("A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled.")
 
 
 
 87
 CLEVENGER, Circuit Judge, dissenting in part.
 
 
 88
 I join the court's opinion in all but two respects, upon which I respectfully dissent. On the first point, I disagree with the ground upon which the court affirms the judgment of the district court that the claims of the `809 and `906 are not infringed. For the reasons that follow, I would reverse the district court's interpretation of the "axial peripheral lip" limitation, and thus not rely on that limitation to sustain the judgment of noninfringement. Instead, I would apply the correct interpretation of the "wheel face outer surface" limitation to the accused products, and in so doing would employ the uncontested facts to sustain the district court's judgment of noninfringement on this alternate ground.
 
 
 89
 Second, for the reasons stated below, I disagree with the court's affirmance of the district court's finding of infringement of claims 11-13, 20, 24, and 25 of the `213 patent. I think we should have rejected these findings as clearly erroneous, on the ground that the evidence failed to prove that the accused devices met the Ford durability testing standard set by the district court as the measurement device for assessing infringement of the "permanently secure" claim limitation.
 
 
 90
 * I would reverse the district court's interpretation of "axial peripheral lip." However, as I conclude that the construction of "wheel face outer surface" compels a finding of noninfringement, I concur with the court's opinion on this issue.
 
 
 91
 The district court's claim construction of "axial peripheral lip" is unusual. Defining "axial peripheral lip" as the "uncovered surface of the composite wheel that starts at the edge of the cladding, goes up and over the top of the projecting rim lip, and ends where the outer side of the rim lip merges with the tire mounting surface of the wheel rim" (emphasis in original) literally means that the accused products must meet the claim requirement that the ornamental surface "not cover" the axial peripheral lip, since the axial peripheral lip, by the district court's definition, is uncovered. This renders the district court's finding of noninfringement somewhat opaque.
 
 
 92
 The district court's claim construction views the "axial peripheral lip" as including both some portion of the wheel wall below the innermost edge of the wheel rim (facing the center of the wheel) as well as the top of the wheel rim. This is evident from both the district court's definition given above, as well as its characterization of the defendant's ornamental panel as "terminat[ing] just shy of the tip of the lip." The parties concede that the term "axial peripheral lip" has no particular meaning in the art. The standard dictionary definition of "lip" is given as "an edge, rim, or margin," or even more specifically as the "edge or margin of a hollow vessel." Webster's 3rd New International Dictionary 1318 (1993). Here, the diagrams indicate two separate edges on the wheel rim, an interior one facing the center of the wheel, and an external one facing the outside. In this context, the "axial peripheral lip" logically refers to the external one — the one furthest from the center of the wheel. However, there is an alternative possibility: the "axial peripheral lip" could also refer to the combination of both "edges," along with the flat portion of the wheel rim in between.
 
 
 93
 Either of these definitions is inconsistent with the district court's interpretation of "axial peripheral lip," specifically the inclusion in the definition of some portion of the wheel wall below the innermost edge of the wheel rim. Both are strongly supported by the prosecution history. The claims at issue were amended in response to an office rejection for unpatentability in light of the Beith reference. Beith discloses a lip 43 "formed to grip the edge of the terminal flange 29 of the multi-flanged tire mounting rim 21 and, thereby, aid in fixing the wheel cover 12 to the wheel 13." Figures 2 (see below) and 5 depict lip 43 doing precisely this — extending over and around the outer circumferential edge of the rim to "grip" the wheel.
 
 
 94
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 95
 In response to this rejection, the patentee added the requirement that the ornamental panel "not cover" the axial peripheral lip. As can be seen from Figure 2, in order to distinguish over Beith, the patentee needed to emphasize that his ornamental panel did not overlap the very outer edge of the wheel rim.
 
 
 96
 It is difficult to square the import of this amendment with a claim construction interpreting "axial peripheral lip" as including some undefined portion of the wheel wall below the interior "edge," particularly if we presume that the patentee only surrendered enough structure to get out from under Beith.
 
 
 97
 As a result, I would reverse the district court's claim construction as to "axial peripheral lip," interpreting it instead as either the outer terminal edge or, alternatively, the highest point on the wheel rim.
 
 
 98
 I now turn to the "wheel face outer surface" claim limitation. The claim language expressly characterizes the wheel face outer surface, providing that "said web portion and said peripheral rim portion defin[e] a wheel face outer surface." `809 patent, col. 11, II. 4-5. This appears to be a closed definition, the wheel face outer surface consisting of only two elements — the central web portion and the peripheral rim portion. The claim language further defines the axial peripheral lip as "circumscribing said peripheral rim portion," id. at col. 11, ll. 1-2, and requires that the ornamental panel cover "said entire wheel face outer surface," id. at col. 11, l. 10 (emphasis added).
 
 
 99
 To my mind, this claim language explicitly defines the wheel face outer surface as extending precisely up to the terminal boundary of the peripheral rim portion — the axial peripheral lip. Indeed, despite its differing construction of "axial peripheral lip," this is what the district court concluded as well. This interpretation would thus allow no portion of the peripheral rim portion to be uncovered by the ornamental panel.
 
 
 100
 Such a conclusion is problematic, however, given Figures 3 and 5 of the `809 and `906 patents. These clearly depict the ornamental panel as only covering part of the peripheral rim portion. The above interpretation would thus read out the preferred embodiment.
 
 
 101
 As a general rule, claim interpretations, which operate to exclude the preferred embodiment, are "rarely, if ever, correct and require highly persuasive evidentiary support." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1578 (Fed.Cir.1996). However, we have found that such a conclusion can be mandated by clear intrinsic evidence, such as "unambiguous" claim language. Elekta Instrument v. O.U.R. Sci. Int'l, 214 F.3d 1302, 1308, 54 USPQ2d 1910, 1914 (Fed. Cir.2000). See also Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 61 USPQ2d 1368 (Fed. Cir.2002) (reaching a claim interpretation excluding some of the preferred embodiments in light of the prosecution history). Here, the claim language is quite explicit in both defining the "wheel face outer surface" and in requiring it to be completely covered by the ornamental panel, and I would find that it constitutes an exception to the general rule.
 
 
 102
 Indeed, the linkage of the two claim requirements, that the cladding cover the entire wheel face outer surface, but that it not cover the axial peripheral lip only has meaning in the situation where the axial peripheral lip is actually providing a boundary for the overlay. Any other construction of "wheel face outer surface" would essentially mean that there is a separate interior boundary for the overlay coverage. In such a situation, the requirement that the overlay not cover the axial peripheral lip is surplusage.
 
 
 103
 Rejecting the above construction leaves open a substantial question as to what the "wheel face outer surface" actually is. Lacks's suggestion that it merely requires partial coverage of the "peripheral rim portion" is extremely unsatisfying. First, the claim language describes "said web portion and said peripheral rim portion defining a wheel face outer surface." If this language includes both elements in the definition, then full coverage is required. If it does not, Lacks's suggestion that "partial" coverage of the rim portion suffices would make the use of "entire" completely meaningless — there would be no way to define how much coverage of the peripheral rim portion is required.
 
 
 104
 The district court used the Hayes diagram to evaluate the accused device. Lacks's brief references the same diagram. It discloses an ornamental panel terminating, as the district court found, "just shy of the tip of the lip." Neither of the parties dispute that this is an accurate representation of the accused product.
 
 
 105
 Employing the claim constructions given above, the district court's finding of noninfringement can be sustained. Even if the accused product meets the limitation requiring that the ornamental panel not cover the "axial peripheral lip," the ornamental panel does not cover the entire wheel face outer surface, as there is a gap between the ornamental panel and the axial peripheral lip. The district court's grant of summary judgment of noninfringement of the claims of the `809 and `906 patents was correct, for the reasons I have stated.
 
 II
 
 106
 Hayes and McKechnie cross-appeal the finding of infringement of the asserted claims of the `213 patent. For the reasons that follow, I agree with Hayes and McKechnie, and disagree with the contrary decision by the court affirming the district court's resolution of this issue.
 
 
 107
 Claims 11-13, 20, and 24-25 of the `213 patent require that the adhesive "permanently secure" the overlay to the wheel. `213 patent, col. 15, l. 31. The district court interpreted this to require that the adhesive be "itself capable of securing the overlay to the wheel during the normal useful life of the wheel" (emphasis in original). The Special Master concluded that this test was met if the adhesive:
 
 
 108
 (1) ... satisfies the specifications set forth on the Hayes engineering drawing for the accused F 150 wheel (Exh. 42) and (2) retains sufficient retentive strength (without reliance on the mechanical locking system) to secure the overlay throughout Ford's vehicle durability testing, but with a modified upper temperature limit as discussed below.
 
 
 109
 This is a very reasonable test. Unfortunately, it is not applied. Having established the Ford vehicle durability testing as a key component of the infringement test, the Special Master's report indicates that not only is there almost no evidence as to what the Ford testing consists of, there is no evidence that there was ever any testing of the wheel on an actual vehicle.
 
 
 110
 First, the Special Master notes, "[w]ith regard to the Ford durability testing conditions, the Special Master finds the record to be somewhat incomplete. There is no description of what type of corrosion testing is performed as part of such durability tests on the vehicle, or the other durability testing performed at the Ford's Arizona Proving Ground...." The report also states:
 
 
 111
 With regard to Ford's own durability testing on driven vehicles, Mr. Thomas Heck [a Hayes director] testified that these generally consisted of corrosion testing and power train durability testing. The accused Hayes wheels had to pass these Ford tests. There was no testimony or documentation concerning what Ford would consider acceptable performance of the wheel overlays during such tests. [Emphasis added.]
 
 
 112
 In other words, having set up "Ford's vehicle durability testing" as a key element in evaluating the claim, the Special Master seems to be explicitly acknowledging that it is uncertain as to what that durability testing actually is.
 
 
 113
 Second, the Special Master also explicitly states that "[t]here is no evidence, however, of vehicle testing on the accused wheels with the mechanical lock component of the overlay system disabled and only the adhesive component of the overlay system operative" (emphasis in original). This, again, is somewhat problematic in light of the Special Master's own definition of the test for infringement as requiring just such a demonstration.
 
 
 114
 Lacks accurately points out that the Smithers rotary, radial fatigue, and impact testing was done (pursuant to standard testing procedure) on individual wheels with the mechanical locking system disabled. Under our deferential standard of review of factual issues, these might suffice to support a finding of infringement, had they actually comprised part of the Special Master's own test for infringement. However, as mentioned above, the Special Master explicitly required that the adhesive demonstrate retentive strength "throughout Ford's vehicle durability testing" (emphasis added). This language itself contains the word "vehicle," strongly suggesting that some of the testing should be on an actual vehicle. In addition, despite the apparent uncertainty discussed above as to what Ford's durability testing consisted of, the Special Master described at least "one phase of Ford's durability testing" as consisting of an actual vehicle test drive. As cited above, the report also references "Ford's own durability testing on driven vehicles." In contrast, the alternative tests are not Ford durability tests, nor even vehicle tests, and thus are not probative under the standard of evaluation defined by the Special Master.
 
 
 115
 Third, as the Special Master noted, the only other testing performed with the mechanical lock disabled, the McKechnie "pull-off test," was "not designed as a durability test or simulation of any particular type of removal force that would be encountered in the field," much less a Ford durability test. Again, were the Special Master to have simply cited this test as evidence in favor of the fact that the accused device met the "permanently secure" claim limitation, it would likely survive our deferential standard of review. Here, however, having established the Ford durability test as an explicit standard for how to evaluate infringement, the Report's reliance on evidence, which falls outside of this standard, is both logically and legally incorrect.
 
 
 116
 We thus should conclude that the Special Master's decision as to infringement of the `213 patent claims is clearly erroneous, and that the district court accordingly should have rejected these findings and entered judgment of noninfringement of the asserted claims of the `213 patent.